UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ASSURANCE COMPANY OF AMERICA; AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY; and NORTHERN INSURANCE COMPANY OF NEW YORK, <br><br> Plaintiffs, <br> vs. <br><br> IRONSHORE SPECIALTY INSURANCE COMPANY, <br><br> Defendant. | Case No.: 2:13-cv-2191-GMN-CWH <br><br> **ORDER** |

Pending before the Court is Defendant Ironshore Specialty Insurance Company's Motion for Summary Judgment, (ECF No. 55). Plaintiffs Assurance Company of America, American Guarantee and Liability Insurance Company, and Northern Insurance Company of New York filed a Response, (ECF No. 59), and Defendant Ironshore filed a Reply, (ECF No. 65).

Also before the Court is Plaintiffs' Cross Motion for Partial Summary Judgment, (ECF No. 60). Defendant Ironshore filed a Response, (ECF No. 68), and Plaintiffs filed a Reply, (ECF No. 70). For the reasons discussed below, Defendant Ironshore's Motion will be granted in part and denied in part, and Plaintiffs' Motion will be denied in full.[1]

I.  **BACKGROUND**

This case arises from a dispute between co-insurers over coverage for sixteen separate underlying construction defect suits in Nevada state court. (Second Am. Compl. ¶ 3, ECF No. 15). Specifically, Plaintiffs claim that Defendant Ironshore wrongfully failed to defend their

---

[1] As the Court is denying Plaintiffs' Cross Motion for Summary Judgment, the pending Motions to Strike, (ECF No. 61), and Motion to Shorten Time, (ECF No. 62), will be denied as moot.

insureds and provide coverage in: (1) *Bagley v. All Drywall and Paint*, Clark County Case No. A620609; (2) *Blasco v. Rhodes Design*, Clark County Case No. A578060; (3) *Ishihama v. Terravita Home Construction Co.*, Clark County Case No. A632302; (4) *Garcia v. Centex Homes*, Clark County Case No. A616729; (5) *Stacy v. American West Homes, Inc.*, Clark County Case No. A575959; (6) *Cohen v. Nigro Desert Bloom, LLC*, Clark County Case No. A591492; (7) *Wright v. Carina Corp.*, Clark County Case No. A602989; (8) *Colford v. American West Homes, Inc.*, Clark County Case No. A593923; (9) *Torrey Pines Ranch Estates HOA v. U.S. Home Corp.*, Clark County Case No. A571846; (10) *Macias v. DW Arnold, Inc.*, Washoe County Case No. CV10-02863; (11) *Epstein Family Trust v. Westgate Properties*, Clark County Case No. A624664; (12) *Evers v. Fairway Pointe, LLC*, Clark County Case No. A614799; (13) *Boyer v. PN II*, Clark County Case No. A603841; (14) *Mystic Bay HOA v. Richmond American Homes*, Clark County Case No. A611595; (15) *Aurora Glen HOA v. Pinnacle-Aurora II, LP*, Clark County Case No. A605463; and (16) *Larkin v. Comfort Residential*, Washoe County Case No. CV09-03256.

In each of these underlying cases, despite the fact that the insureds had commercial general liability policies with both Plaintiffs and Defendant Ironshore, they were defended and indemnified only by Plaintiffs. The insureds' policies with Defendant Ironshore afforded coverage between varying dates in the years 2009, 2010, and 2011. In each case, Defendant Ironshore issued a denial letter stating that the insured's work was completed prior to the onset of the policy, and therefore coverage was not triggered pursuant to the policy's "Continuous or Progressive Injury or Damage Exclusion." *See, e.g.*, (Jan. 24, 2011, Cedco Denial Letter p. 2, ECF No. 55-6); (Champion Masonry Denial Letter p. 2, ECF No. 59). In the instant case, Plaintiffs allege that the claims were wrongly denied by Defendant Ironshore, and that Defendant Ironshore had a duty to defend and indemnify the insureds in each of the sixteen underlying actions.

Based on these allegations, Plaintiffs set forth claims for (1) declaratory relief; (2) contribution; and (3) equitable indemnity with regard to each of the underlying actions. (Sec. Am. Compl. ¶¶ 4-373).  On September 30, 2014, the Court granted Plaintiffs' Motion for Partial Summary Judgment, and declared that Defendant Ironshore had a duty to defend in one of the underlying actions.  In its instant Motion, Defendant Ironshore argues that it is entitled to summary judgment as to Plaintiffs' remaining forty-seven claims for relief.  In their Cross Motion, Plaintiffs argue that summary judgment is warranted as to their fifteen remaining declaratory relief claims.

## II. **LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing

the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not

significantly probative, summary judgment may be granted. *See id.* at 249-50.

## III. DISCUSSION

In its Motion, Defendant Ironshore argues that it is entitled to summary judgment as to Plaintiffs' claims for: (1) declaratory relief; (2) equitable indemnity; and (3) contribution. The Court will address each of these categories of claims in turn.

### A. Declaratory Relief

Defendant Ironshore argues that the Court should enter summary judgment as to Plaintiffs' remaining declaratory relief claims because each of the underlying actions has now concluded, and Plaintiffs may obtain adequate and full redress for their alleged damages through their claims for indemnity and contribution. Indeed, it is well established that the purpose of declaratory relief is to "bring[] to the present a litigable controversy, which otherwise might only be tried in the future." *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 943 (9th Cir. 1981). Courts routinely decline to hear claims for declaratory relief when a party has asserted other claims which would fully and adequately determine the matters in controversy. *See, e.g.*, *Phillips Med. Capital, LLC, v. Med. Insights Diagnostics Ctr., Inc.*, 471 F. Supp. 2d 1035, 1048 (N.D. Cal. 2007); *Lucey v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, No. 2:07-cv-0658-RLH-RJJ, 2007 WL 4563466, at *7 (D. Nev. Dec. 18, 2007).

In this case, it is undisputed that Plaintiffs settled each of the underlying actions on behalf of the insureds. *See* (Pls.' Resp. 33:3-19). Thus, as this case now involves only past conduct which can be fully remedied by Plaintiffs' claims for equitable indemnity and contribution, the Court finds declaratory relief to be inappropriate, and will decline to entertain these claims. Accordingly, Defendant Ironshore's Motion for Summary Judgment will be granted as to Plaintiffs' claims for declaratory relief, and Plaintiffs' Cross Motion for Summary Judgment will be denied.

### B. Equitable Indemnity

Defendant Ironshore argues that summary judgment is warranted as to Plaintiffs' claims for equitable indemnity because Nevada does not recognize this cause of action between co-insurers. The Nevada Supreme Court has explicitly stated, "Noncontractual or implied indemnity is an equitable remedy that allows a defendant to seek recovery from *other potential tortfeasors* whose negligence primarily caused the injured party's harm." *Rodriguez v. Primadonna Co., LLC*, 216 P.3d 793, 801 (Nev. 2009) (emphasis added). Further, the Nevada Supreme Court has also held that a claim for equitable indemnity requires "a preexisting legal relationship" between a plaintiff and a defendant or "some duty on the part of [a] primary tortfeasor to protect [a] secondary tortfeasor." *Id.* Plaintiffs have failed to provide any Nevada precedent, and the Court is unaware of any, to show that such a claim has ever been allowed to proceed between co-insurers. Additionally, Plaintiffs fail to allege any preexisting legal relationship with Defendant Ironshore or any reason why Defendant Ironshore had a specific duty to protect Plaintiffs. Accordingly, Defendant Ironshore's Motion for Summary Judgment will be granted as to Plaintiffs' equitable indemnity claims.

### C. Contribution

A claim for contribution arises under Nevada law "where two or more persons become jointly or severally liable in tort for the same injury to person or property." Nev. Rev. Stat. § 17.225. The right of contribution exists in favor of an individual "who has paid more than his or her equitable share of the common liability." *Pack v. LaTourette*, 277 P.3d 1246, 1249 (Nev. 2012) (emphasis omitted).

Defendant Ironshore argues that it lacked a duty to defend or duty to indemnify the insureds in the underlying actions, and therefore it asserts that Plaintiffs have failed to show that there is any "common liability" to give rise to a contribution claim. Plaintiffs argue that the policy exclusions cited by Defendant Ironshore did not apply in the underlying actions, and thus

Defendant Ironshore should be held liable for its share of the costs incurred in defending and indemnifying the insureds. In assessing these claims, the Court will first address whether Defendant Ironshore had a duty to defend in the underlying actions, and will then address its duty to indemnify.

### 1. Duty to Defend

Under Nevada law, the duty to defend is broader than the duty to indemnify, and there is no duty to defend where there is no potential for coverage. *United Nat'l Ins. Co. v. Frontier Ins. Co.*, 99 P.3d 1153, 1158 (Nev. 2004). "A potential for coverage only exists when there is arguable or possible coverage." *Id.* However, if there is any doubt as to whether the duty to defend arises, this doubt must be resolved in favor of the insured, and once the duty to defend arises, it continues throughout the course of the litigation. *Id.* "The purpose behind construing the duty to defend so broadly is to prevent an insurer from evading its obligation to provide a defense for an insured without at least investigating the facts behind a complaint." *Id.* "Determining whether an insurer owes a duty to defend is achieved by comparing the allegations of the complaint with the terms of the policy." *Id.*

As relevant to this case, each of the Ironshore commercial general liability policies contained identical language regarding coverage:

> We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the Insured against any "suit" seeking those damages. . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
> (1) The "bodily injury" or "property damage" is caused by an "occurrence that takes place in the "coverage territory";
> (2) The "bodily injury" or "property damage" occurs during the policy period . . .

*See, e.g.*, (Champion Masonry Policy pp. IRONNV 1407, ECF No. 55-8).

However, each of the policies also contained an identical Continuous or Progressive Injury or Damage Exclusion, which stated:

> This insurance does not apply to any "bodily Injury" or "property damage":
>
> 1. which first existed, or is alleged to have first existed, prior to the Inception of this policy. "Property damage" from "your work", or the work of any additional insured, performed prior to policy inception will be deemed to have first existed prior to the policy Inception, unless such "property damage" is sudden and accidental and takes place within the policy period or
>
> 2. which was, or is alleged to have been, in the process of taking place prior to the Inception date of this policy, even if the such "bodily injury" or "property damage" continued during this policy period; or
>
> 3. which is, or is alleged to be, of the same general nature or type as a condition, circumstance or construction defect which resulted in "bodily Injury" or "property damage" prior to the Inception date of this policy.

*See, e.g.*, (PR Construction Policy pp. IRONNV 2165, ECF No. 55-12).

Defendant Ironshore asserts that it correctly applied the Continuous or Progressive Injury or Damage Exclusion because the work that caused the alleged property damage occurred before the beginning of the policy period in each underlying case and was not alleged to have been sudden and accidental. Because of this, Defendant Ironshore argues that it lacked a duty to defend.

In assessing this argument, the Court will analyze whether the exclusion was applicable to each of the underlying cases. Because the *Garcia*, *Blasco*, *Colford*, *Cohen*, *Stacy*, *Epstein*, *Evers*, and *Macias* actions were based upon identical allegations, the Court will address those actions first, followed by the remaining actions at issue.

/ / /

### *i.* The *Garcia, Blasco, Colford, Cohen, Stacy, Epstein, Evers,* and *Macias* Actions

The Court previously held that Defendant Ironshore's duty to defend was triggered in the *Garcia* action because the complaint in that case did not specify when the alleged property damage occurred and did not contain sufficient allegations from which to conclude that the damage was not sudden and accidental. (Order 5:22-6:13, ECF No. 27). Notably, the allegations in seven of the other underlying complaints are identical to those set forth in the *Garcia* complaint. Indeed, the complaints in the *Garcia*, *Blasco*, *Colford*, *Cohen*, *Stacy*, *Epstein*, *Evers*, and *Macias* actions each allege:

> Within the last year, Plaintiffs have discovered that the subject property has and is experiencing additional defective conditions, in particular, there are damages stemming from, among other items, defectively built roofs, leaking windows, dirt coming through windows, drywall cracking, . . . and other poor workmanship.

(*Garcia* Complaint ¶ 10, Ex. 33 to Def.'s MSJ, ECF No. 55-9); (*Blasco* Complaint ¶ 10, Ex. 9 to Def.'s MSJ, ECF No. 55-6); (*Colford* Complaint ¶ 10, Ex. 49 to Def.'s MSJ, ECF No. 55-11); (*Cohen* Complaint ¶ 10, Ex. 43 to Def.'s MSJ, ECF No. 55-10); (*Stacy* Complaint ¶ 10, Ex. 55 to Def.'s MSJ, ECF No. 55-11); (*Epstein* Complaint ¶ 10, Ex. 71 to Def.'s MSJ, ECF No. 55-12); (*Evers* Complaint ¶ 10, Ex. 115 to Def.'s MSJ, ECF No. 55-16); (*Macias* Complaint ¶ 10, Ex. 139 to Def.'s MSJ, ECF No. 55-17).

Because the Court recognized that these allegations triggered Defendant Ironshore's duty to defend in *Garcia*, (Order 5:22-6:13, ECF No. 27), it must follow that Defendant Ironshore likewise had a duty to defend in all of the other actions that were based upon the same allegations. Accordingly, because the *Garcia*, *Blasco*, *Colford*, *Cohen*, *Stacy*, *Epstein*, *Evers*, and *Macias* actions each included allegations of property damage which were vague as to their temporal implications and could have included sudden and accidental damage, the Court finds

that Defendant Ironshore had a duty to defend in these actions.

### ii. The *Bagley* Action

Defendant Ironshore denied coverage in the *Bagley* action based only upon a notice filed pursuant to Nev. Rev. Stat. § 40.640. (*Bagley* Denial Letter p. 7, Ex. 8 to Def.'s MSJ, ECF No. 55-6). In this notice, the *Bagley* plaintiffs listed the following construction defects:

> 1. Cracking around the interior windows.
> 2. Water stains around the windows, including but not limited to, the living room, family room, master bed room, upstairs bedrooms and bathrooms.
> 3. Water stain on walls above master bedroom doors. Kitchen cabinets pulling away from walls.
> 4. Water staining around windows. Most notably in upstairs bedroom.
> 5. Cracking and gaps around windows throughout home.
> 6. Sticking windows throughout home most notably in front upstairs windows.
> 7. Problems with operation of window hardware.
> 8. Squeaky flooring in upstairs.
> 9. Water entry at door head in garage entry.
> 10. Cracks in family room, hallway and master bedroom ceilings.
> 11. GFCI circuit breakers tripping excessively.
> 12. Looseness in plumbing faucets
> 13. Backwash and clogging in sinks.
> 14. Inadequate water pressure.
> 15. HVAC system does not heat and cool evenly.
> 16. Stains in exterior walls which appear to be from roof. . . .
> 17. Cracks around exterior door frames.
> 18. Cracks around exterior of windows.
> 19. Cracks on ceilings and walls of garage.
> 20. Sidewalk discolored and speckled.
> 21. Standing water, poor drainage and pooling on balcony.
> 22. Staining on balcony.
> 23. Rust on balcony railing.
> 24. Balcony/patios pulling away from building.
> 25. Electrical panels unbalanced.
> 26. Water intrusion under the threshold of the garage man door.

(Lofton Compliance Notice, Ex. A to *Bagley* Demand Letter, Ex. 5 to Def.'s MSJ, ECF No.

556).  Though Defendant Ironshore is correct that some of these defects may have existed prior to the coverage period, the text of this document certainly does not preclude the possibility that these alleged defects first arose during the coverage period and were sudden and accidental.  Thus, the Court finds that the notice of defects related to the *Bagley* action triggered Defendant Ironshore's duty to defend.

### *iii.* The *Ishihama* Action

Defendant Ironshore denied coverage in the *Ishihama* action after the underlying complaint was filed in Clark County District Court. (*Ishihama* Denial Letter p. 2, Ex. 26 to Def.'s MSJ, ECF No. 55-8).  That complaint alleged that the plaintiffs had suffered property damage in the form of "drywall cracking throughout the interior of the Subject Property at various locations including but not limited to the living room, garage, dining room, kitchen, the hallways, the entry and the bedrooms, . . . stucco cracking, block wall cracking/separation, uplifting or separation of flooring and concrete cracking or separation." (*Ishihama* Complaint ¶ 15, Ex. 23 to Def.'s MSJ, ECF No. 55-7).  The *Ishihama* complaint proceeded to allege, "While the underlying defect causing the damage is unknown at this time, it is suspected that the following may be causing the damage: trusses, joists, drywall attachment or lack thereof, soils movement, poor soils compaction, poor drainage, foundational defects/deficiencies, slab defects/deficiencies, lack of structural reinforcement, structural deficiencies, architectural deficiencies and design defects/deficiencies." (*Id.*).

Similar to the allegations in the actions that have already been addressed, the allegations in the *Ishihama* complaint lack any specific reference to when the alleged property damage arose, or whether this damage was sudden and accidental.  Accordingly, the Court finds that this complaint gave rise to a possibility of coverage under the Ironshore policy and therefore triggered Defendant Ironshore's duty to defend.

/ / /

### iv. The *Wright* Action

Defendant Ironshore also denied coverage in the *Wright* action based upon the substance of the complaint. (*Wright* Denial Letter p. 7, Ex. 63 to Def.'s MSJ, ECF No. 55-11). The complaint in the *Wright* action alleged:

> After work at the SUBJECT PROPERTY was performed, PLAINTIFFS became informed, believes [sic] and thereon alleges [sic], that the SUBJECT PROPERTY, and components, in particular, are not of merchantable quality, but, in fact, are defective and fail to meet all applicable building codes and industry standards and has [sic] caused damage to the SUBJECT PROPERTY. The damages known to PLAINTIFFS at this time are progressive and continue to worsen.

(*Wright* Complaint ¶ 44, Ex. 64 to Def.'s MSJ, ECF No. 55-11). As relevant here, this claim is vague as to when the property damage began, and does not imply that the damage was not sudden and accidental. Accordingly, the Court finds that the allegations in the *Wright* action gave rise to a possibility of coverage under the Ironshore policy, and therefore Defendant Ironshore had a duty to defend.

### v. The *Torrey Pines* Action

Defendant Ironshore denied coverage in the *Torrey Pines* action following the filing of the complaint. (*Torrey Pines* Denial Letter p. 7, Ex. 113 to Def.'s MSJ, ECF No. 55-15). The plaintiffs in that case alleged that they had "sustained and suffered consequential damages resulting from defendants' acts and/or omissions including, without limitation, physical damages and/or destruction of tangible property and the loss of use of Common Areas; consequential damages to the masonry walls within the Common Areas; damage to separate interests related to defect in Common Areas; and damage to personal property related to defects in Common Areas." (*Torrey Pines* Complaint ¶ 25, Ex. 106 to Def.'s MSJ, ECF No. 55-15).

These allegations do not specify when the alleged property damage at issue began, and no reasonable inference can be drawn as to whether the alleged damages were sudden and

accidental. Therefore, the Court finds that the complaint in the Torrey Pines action gave rise to a possibility of coverage under the Ironshore policy, and triggered Defendant Ironshore's duty to defend.

### vi. The *Boyer* Action

Defendant Ironshore denied coverage in the *Boyer* action based upon the allegations set forth in the complaint. (*Boyer* Denial Letter p. 7, Ex. 94 to Def.'s MSJ, ECF No. 55-14). The complaint in the *Boyer* action stated:

> Plaintiffs are informed and believe and thereupon allege that the Subject Properties were and are not of merchantable quality, nor fit for the purpose as residential dwelling units and is defective, and other components and sources not yet identified or ascertained are not performing in the manner intended. The works of improvement at the Subject Properties are not of merchantable quality, but, in fact, are defective and have resulted in damage to the common areas and the residential units and structures thereon.

(*Boyer* Complaint ¶ 21, Ex. 87 to Def.'s MSJ, ECF No. 55-14). These allegations do not specify when the alleged property damage first arose, and do not indicate that the damage was not sudden and accidental. Thus, the Court finds that these allegations gave rise to the possibility of coverage under the Ironshore policy, and triggered Defendant Ironshore's duty to defend.

### vii. The *Mystic Bay* Action

Defendant Ironshore denied coverage to its insured in the *Mystic Bay* action based upon the allegations set forth in that case's complaint. (*Mystic Bay* Denial Letter p. 7, Ex. 105 to Def.'s MSJ, ECF No. 55-15). That complaint alleged that the named defendants, including Defendant Ironshore's insured, "failed to properly and adequately investigate, design, inspect, plan, engineer, supervise, construct, produce, manufacture, develop, prepare, distribute, supply, market, sell and/or manage the Subject Property and its component parts, in that the Subject Property and all component parts therein, experienced, and continue to experience, defects and deficiencies, and damages resulting therefrom . . . ." (*Mystic Bay* Complaint ¶ 15, Ex. 102 to

Def.'s MSJ, ECF No. 55-14). The Court finds that Defendant Ironshore incorrectly applied the Continuous or Progressive Injury or Damage Exclusion to this case, because the allegations in the complaint do not specify when the alleged property damage arose or indicate that the damage was not sudden and accidental. Accordingly, the Court finds that Defendant Ironshore had a duty to defend its insured in the *Mystic Bay* action.

### viii. The *Aurora Glen* Action

Defendant Ironshore denied coverage to its insured in *Aurora Glen* after the filing of the complaint. (*Aurora Glen* Denial Letter p. 7, Ex. 83 to Def.'s MSJ, ECF No. 55-13). That complaint alleged,

> Plaintiff is informed and believes and thereupon alleges that as a direct and proximate result of the defects set forth herein, Plaintiff has suffered damages in an amount precisely unknown, but believed to be within the jurisdiction of this Court in that it has been and will hereafter be required to perform works of repair, restoration, and construction to portions the structures and real property to prevent further damages and to restore the structures and real property to their proper condition.

(*Aurora Glen* Complaint ¶ 25, Ex. 84 to Def.'s MSJ, ECF No. 55-13).

Because this complaint is devoid of any allegations regarding the specific time the property damage arose or any indication that the damage was not sudden and accidental, it triggered Defendant Ironshore's duty to defend.

### ix. The *Larkin* Action

Finally, in *Larkin*, Defendant Ironshore also denied coverage based on the allegations set forth in the complaint. (*Larkin* Denial Letter p. 9, Ex. 130 to Def.'s MSJ, ECF No. 55-17). The complaint in *Larkin* specifically listed numerous alleged defects, including, *inter alia*, adverse soil conditions, poor drainage, grading deficiencies, roof leaks, cabinet deficiencies, odor from plumbing fixtures and fireplace, lack of water pressure, and excessive noise in walls. (*Larkin* Complaint ¶ 17, Ex. 122 to Def.'s MSJ, ECF No. 55-16). The complaint further alleged that the

listed defects had caused damage to other parts of the properties at issue. (*Id.* ¶ 17).  Just as in the other complaints, the *Larkin* complaint did not specify when the alleged property damage at issue began vis-à-vis the Ironshore policy period, nor did it negate a possible inference that the alleged damage was sudden and accidental.  Accordingly, the Court finds that the *Larkin* complaint gave rise to a possibility of coverage, and triggered Defendant Ironshore's duty to defend. [2]

2. Duty to Indemnify

Defendant Ironshore argues that even if it had a duty to defend in the underlying actions, Plaintiffs have failed to provide evidence demonstrating that Defendant Ironshore had a duty to indemnify its insureds.  However, by making this argument, Defendant Ironshore mischaracterizes the Plaintiffs' burden.  Indeed, in cases in which a nonparticipating co-insurer is found to have had a duty to defend in an already settled action, the insurer attempting to disclaim coverage bears the burden of proving the applicability of any policy exclusions. *E.g.*, *PMA Capital Ins. Co. v. Am. Safety Indem. Co.*, 695 F. Supp. 2d 1124, 1125 (E.D. Cal. 2010) ("Once a party claiming coverage shows a potential for coverage under the coinsurer's policy, the coinsurer must conclusively prove with undisputed evidence that no coverage existed under the policy."); *Safeco Ins. Co. of Am. v. Superior Court*, 44 Cal. Rptr. 3d 841, 845 (Cal. Ct. App. 2006) ("Although a nonparticipating coinsurer waives its right to challenge the reasonableness of the amount of a settlement, it retains its right to raise other coverage defenses as affirmative

---

[2] Defendant Ironshore also argues that it lacked a duty to defend in many of the underlying actions because the policies at issue contained an exclusion regarding damage to the insured's own work.  However, as evidenced by the text of the complaints, none of the underlying actions alleged damages that were expressly limited to the insured's own work, therefore this exclusion did not relieve Defendant Ironshore of its duty to defend.

Similarly, Defendant Ironshore argues that it lacked a duty to defend in several of these actions because the losses may have been known by the insureds before the related complaints were filed.  Without determining whether such a theory could relieve Defendant Ironshore of its duty to defend, the Court finds that the "known loss rule" is not applicable to this case, as each of the complaints at issue is so vague regarding the nature and timing of the underlying property damage that it is impossible to conclude from the evidence in the record whether each insured was aware of the damage before their Ironshore policy went into effect.

defenses in a contribution action—which means, of course, that the recalcitrant coinsurer has the burden of proof on those issues."); *see also, e.g.*, *Tilden-Coil Constructors, Inc. v. Landmark Am. Ins. Co.*, 721 F. Supp. 2d 1007, 1013 (W.D. Wash. 2010) ("If an insurer wrongfully denies coverage or refuses to provide a defense, the insured is free to negotiate a settlement with the plaintiff, and that settlement creates an evidentiary presumption of liability and damages for purposes of a subsequent suit against the insurer.").

Therefore, the question at issue is not whether Plaintiffs have sufficiently shown that Defendant Ironshore had a duty to indemnify, but instead whether *Defendant Ironshore* has sufficiently shown that it *lacked* a duty to indemnify in the underlying cases due to the exclusions in its policies. As Defendant Ironshore has not presented evidence demonstrating that the property damage alleged in the sixteen underlying cases fell within its policy exclusions, it has failed to carry this burden, and its Motion for Summary Judgment will accordingly be denied as to Plaintiffs' contribution claims.

## IV.  CONCLUSION

**IT IS HEREBY ORDERED** that Defendant Ironshore's Motion for Summary Judgment, (ECF No. 55), is **GRANTED IN PART AND DENIED IN PART pursuant to the foregoing**.

**IT IS FURTHER ORDERED** that Plaintiffs' Cross Motion for Partial Summary Judgment, (ECF No. 60), is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Ironshore's Motion to Strike, (ECF No. 61), and Motion to Shorten Time, (ECF No. 62), are **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that judgment shall be entered in Defendant Ironshore's favor as to claims 1, 3, 4, 6, 7, 9, 12, 13, 15, 16, 18, 19, 21, 22, 24, 25, 27, 28, 30, 31, 33, 34, 36, 37, 39, 40, 42, 43, 45, 46, and 48 in the Second Amended Complaint.

/ / /

**IT IS FURTHER ORDERED** that the parties shall submit a Joint Pretrial Order **by Friday, August 28, 2015**.

**DATED** this 29th day of July, 2015.

_____
Gloria M. Navarro, Chief Judge
United States District Judge